Number 181759, Mark W. Flaherty v. Entergy Nuclear Operations, Inc. Mr. Cohen, good morning. Good morning, Your Honor. Saul Cohen on behalf of the appellant, Mark Flaherty. May it please the Court. It's my honor to represent Mark Flaherty in this case. He's a decorated combat veteran of the U.S. Marines. He lives in Massachusetts with his family. And this case, as we know, is an appeal of a summary judgment allowance at the district court on his claim of disability discrimination under the ADA and Chapter 151B. The determinative factors in our appeal, in the gravamen of our appeal, really center on two questions of two rulings of the district court. And those rulings are really determining rulings that resulted in the allowance of the motion for summary judgment. And so much of my argument is focused on those two, pending your questions. The two main rulings that we're appealing are relative to a motion to strike that was filed in the course of the Rule 56 proceeding in the district court. And those are questions of when Mr. Flaherty knew of his diagnosis of chronic fatigue syndrome, or diagnosis of chronic fatigue syndrome. And then secondly, when did he disclose his diagnosis of chronic fatigue syndrome and possibly of post-traumatic stress disorder? Even if we were to consider his affidavit in full without any striking, is it the case that even under his own version he filled out a questionnaire inaccurately and did so intentionally because he thought his supervisors didn't have a right or need to know certain facts about his medical history? So if what he says in his affidavit is taken as true, there was one occasion in 2014, in July or August, I believe, of 2014, where he filled out one questionnaire at a time that he knew he had post-traumatic stress disorder and chronic fatigue syndrome where he did not check those boxes. It wasn't just that he didn't check the boxes. He made a conscious decision that he didn't want his supervisors to know because he said he'd spoken with other people who told him they didn't think that his supervisors had a right to know. And by other people, that's correct, Your Honor. HR people. HR people at Entergy. And so why isn't that in which you're a supervisor at a nuclear power plant, you're in charge of lots of really important safety stuff, and you've got an employee who when you give them a questionnaire to ask them a question, for whatever reason, intentionally misleads the supervisor on an issue that the supervisor certainly reasonably could think would have something to do with the safety of the plant? And why couldn't, it seems to me almost inescapable that someone would then determine that there's an issue of trustworthiness, at least for a nuclear power plant. Well, our position, Your Honor, is that on that question, there's an issue of fact as to whether that sole omission in 2014 at a time when Entergy was aware of his diagnosis. Well, you say Entergy. Someone else in Entergy, but not the person who he knew that his supervisors, who were the ones who were supervising him, didn't know, and he didn't want them to find out. And it's undisputed. He never told them. He, in fact, lied to them. Well, to clarify, the supervisors are not the authority for granting unescorted access, which was the issue. It was the unescorted access authorization department. There was individuals who made those determinations. Now, in the record, if the affidavit was not stricken, there's evidence supporting that those individuals were made aware of the diagnoses. And so that whether the supervisors... Sure, but let's put it this way. He must have thought that there was someone who didn't know who he wanted not to know, so he therefore filled out the form inaccurately. Otherwise, if he felt everyone already knew, he would have filled out the form accurately. And if that's the case, how could we start saying, you know, in a nuclear power plant, it's okay to deceive people as to things that might be relevant to the safety of the plant? Well, I think had Entergy conducted a fair investigation into this, it would have revealed that Mr. Flaherty had, in fact, disclosed his diagnoses, both to Entergy's selected medical examiners in July of 2014 and again in March of 2015. And that's a critical point in time, because March of 2015... I'm sorry, you told us earlier there was an omission deliberately made on a form requiring disclosure. You can't back off that now. No, you're right. I'm not backing off that he didn't check the boxes on that form. All right. Why doesn't that just dispose of this case? Because at the time, Entergy was already aware of his diagnoses. No, no, no. I thought it was quite clear that the chronic fatigue syndrome had not been a reason advanced to his supervisors or anybody else. At the same time, he was claiming veterans' benefits for that very disease. No, so again, this is assuming that... Are you claiming the company had prior knowledge of both of these conditions? Yes, that is our claim. What is the basis for the second condition? So in his affidavit, he makes it clear that in July of 2014, after returning from an FMLA leave, he was examined for fitness for duty by one of Entergy's chosen medical examiners. And at the time, he talked at length about having chronic fatigue syndrome. And that justifies not filling out a form accurately after that date? I wouldn't say it justifies not filling out a form. All right, so we have a legitimate, non-discriminatory reason from the employer, which seems to make a great deal of sense. What is the evidence that that is a pretext? Well, again, Your Honor, the individuals who determine unescorted access were made aware of his diagnoses. Those are the relevant individuals with respect to the articulated reason for the termination. The articulated reason for the termination was that he had never disclosed his diagnoses. He was untrustworthy as, in fact, the employer is required by federal law to make those determinations as to employees with access to all areas of a nuclear power facility. And we say that that is a pretext because at the time that they're claiming that he was untrustworthy because he hadn't disclosed his diagnoses, he had disclosed his diagnoses. So there is a question, in fact, as to whether they were aware at the time that they articulated that reason that it was untrue that in July, almost a year prior, he had disclosed his diagnoses. And again, in March of 2015, during the very process that was designed to determine his fitness for duty and his unescorted access authorization fitness, he had disclosed those conditions. Here's where you're losing me. If somebody writes the head of the IRS and says, I made $10,000 last week, and they walk into the local IRS office and tell everybody there, they can't then go and file a tax return that omits the $10,000 intentionally based on the notion that, well, I told the IRS, I told the government. There's channels to do things in a nuclear power plant. There's like lots of channels to do things and lots of checklists to go through. Here he's trying to say, I think, if I understand your argument, that once you sort of orally tell somebody in HR or the authorization group that you can then lie to whoever else you want to in the plant, including supervisors on your job. I don't see where you're so right about that that we would, therefore, find it to be a pretextual claim for the employer to say to the contrary. Well, then you're right. I'll come back to the fact that Ms. Colburn, who was the access authorization, the individual who determined access authorization, there's evidence that her affidavit is untrue with respect to where she says the reason for the termination was his failure to disclose those diagnoses. Now, I think this case would have gone quite differently had they actually investigated. Once he raised that he's got chronic fatigues from two of his supervisors in April of 2015, an investigation would have revealed simply that, A, he had already disclosed these to Entergy multiple times, B, that there was knowledge with the access authorization department, C, that he had disclosed it within the very process to determine his fitness for access authorization, and that in light of that and his rights under the union collective bargaining agreement, I don't think he would have been terminated. But we won't know that because the case took. Did you file a grievance? Yes. Did you file a grievance? I believe the union elected not to file a grievance for him. The other side, I think, says you've got another what they think is a problem, which is admittedly your client does suffer from these illnesses. Did he propose any accommodation that they rejected that you would say we need to say that that's a reasonable accommodation? That's an important fact. He did, but that was later. That was in April of 2015. Didn't he just say he didn't want to work overtime? Right. So this whole thing was triggered in February of 2015 when he had worked a series of 12-hour shifts and then disclosed rightfully, as is his duty, that he was fatigued and could not work yet another mandatory overtime 12-hour shift in a nuclear facility. And so that triggered this whole process during which he then, yes, requested an accommodation of not being required to work the mandatory overtime at times like that when he was in a series of 12-hour shifts. And, in fact, that should have triggered a fatigue assessment process within Entergy, which inexplicably didn't. But, yes, so the accommodation request came in April, and it was, in fact, a request not to work the mandatory overtime on occasion, particularly when he had already been working multiple 12-hour shifts with chronic fatigue syndrome. I'm sorry. Are you seriously asserting that he could have done this job and met all of the essential functions if only he had been excused from doing overtime? The record doesn't bear that out. Well, I respectfully disagree. The record is that he had worked at this job since 2005 and had done very, very well. There had never been any issues with regards to his mental health, his ability to do the job. And, in fact, his supervisors had certified that he had been a stable nuclear security officer for many years, year after year. That is in the record. So I respectfully disagree that those conditions that the symptoms from which he suffered since 2009 were something that prevented him from performing the essential functions of the job. I don't understand. Wouldn't you agree that trustworthiness is an essential requirement of this type of a job? Absolutely not. And the fact is that he did not fill out the form, which is undisputable, that he didn't fill it out in the way he should have filled it out. Yes, on one occasion he did not fill out the form in the way he did. Oh, one occasion? Okay. But, again, I'll come back to the fact that that was at a time when ENTREGY was already aware, and particularly, most importantly, the Access Authorization Department was already aware of the diagnoses. It wouldn't have made a bit of difference, frankly, whether he checked those boxes or not. And, again, yes, he could be subject to discipline, potentially, for not checking those boxes. If it wouldn't have made a difference, why didn't he check the form? I think he simply didn't want to get into discussion about post-traumatic stress disorder. He wanted to reveal to his employer something where they then might have had a meaningful discussion with him about his ability to do the job. And, again, respectfully, Your Honor, I think the employer here is the definition of the employer is a question. Because, yes, he didn't want to have discussions with his direct day-to-day supervisors of having post-traumatic stress disorder resulting from combat. But he had no problem with the employer. In another sense, it is the Access Authorization Department and HR who were aware of these diagnoses, and they're the ones that determine access authorization. Right, but how about his bosses who decided the shift? According to him, they needed to know that he could not safely work overtime after 12-hour shifts. And yet he made sure they didn't know that he had a medical condition which would have given credibility to that. So, therefore, they could have been assigning him shifts which, by his own claims, he shouldn't be working in a nuclear power plant. Well, that's why he did, in fact, in April of 2015, tell his supervisors that he was not able to do that. But that was a year later after he filled out the form, wasn't it? Correct. Thank you, counsel. Thank you. Mr. Keith, good morning. Good morning, Your Honors. Justin Keith, Greenberg Charter. I'm here with my colleague Amanda Carney on behalf of Intergy Nuclear Operations. The district court got it right. Intergy is an NRC-regulated employer. It's not a typical employer. Pilgrim Station is not a typical workplace. And security officers like Mr. Flaherty are not typical security guards like you find at a mall or in a retail store. The issue in this case is trustworthiness and reliability as those requirements are imposed on Intergy by the NRC in its implementing regulations. I want to start by responding to a question that Judge Troya asked about whether there was a union grievance filed here. And much is made by appellant about the notion that Intergy, during the access authorization review that led to his denial, should have probed into whether he had, in fact, disclosed. And I'll just put aside for the moment the fact that Judge Taylor correctly exercised his discretion striking the portions of the affidavit and finding that the disclosure happened in April 29, 2015, which is consistent with everything in the record. Put that aside for a moment. There is a process in access authorization, and this is in the record, where individuals whose access is denied can appeal. And Mr. Flaherty filed an appeal here. The union filed an appeal on his behalf. That would have been the time, had he, in fact, disclosed prior to the date that Intergy thinks he disclosed, to say, hold on. You got it wrong. Look at this date. Go talk to this provider. Go talk to this person over here. He didn't do any of that. He put an appeal in, which was not a one or two sentence. It was a full-page email from the union, and it said two things. It said, one, he wasn't required to disclose to his supervisors because he didn't think it affected his ability to do the job, which I think he's quite wrong about that, and, two, made an allegation that he was actually terminated because of some unspecified protected union activity. There are no words in that appeal that say, I disclosed prior to this date. You should have considered it. You missed it. So we think on that point alone, this issue is fatal. I also want to just talk briefly about this issue of the chronology because I think the assumption that was being proceeded on during Appellant's argument, and I think we still win on that, is what I would call a best-case chronology for Mr. Flaherty, which is he told someone in 2014 when he returned from FMLA that he had chronic fatigue, still filled out a form incorrectly, and then refused over time and made the official disclosure in April 2015. But it really goes back much further than that. The record evidence is clear that he was diagnosed in the middle of 2012, so we have not one, not two, but three annual medical forms where he fails to check the boxes, fails to disclose. And the district court, in exercising its discretion to strike the affidavit, looked at the clear question, which is April 29, 2015 was the first date you disclosed. He says that's correct. There's no ambiguity there. He's not offered a satisfactory explanation. Not only is there that basis in the record, if you go back to his agency filing at the MCAD, which was the first charge he filed in this case, he says in there, which is a document signed in with the pains and penalties of perjury, on April 29, 2015, I informed Entergy that I had chronic fatigue syndrome. He doesn't say I informed some person at Entergy. He says I informed Entergy, the company. We know that's not true. A year later when he files his complaint in the district court, he says the same thing. April 29, 2015, I informed Entergy. Again, on that record, there's no basis to believe that the district court abused its discretion. So I think when you look at what the actual time period is between the diagnosis and the disclosure and all of it intervening, repeated failures to disclose, I don't think this is a close call at all. Even if it were, though, in an NRC-regulated environment, the regulations show that in close calls we've got to go with what the NRC says. So we've got on the one hand an NRC regulation that says you must provide quote high assurances that individuals with unescorted access are quote trustworthy and reliable. You have to provide those high assurances. These are people walking around armed with heavy artillery inside a secure area of the plant by themselves. You've got that regulatory scheme. On the other hand, you've got a security officer appellant here who says, yes, I lied at one point because I didn't want some people to know, but I made a disclosure to someone somewhere, and that relieves me of all obligations. I think the analogy to the IRS is directly on point. The through line of appellant's argument here is once I said chronic fatigue out loud to someone, then forever I could misrepresent and I could lie. We don't think that that's the case. But moreover, the issue here is did Entergy discriminate against Mr. Flaherty because he had a disability? The issue isn't did it follow its access authorization program perfectly. The issue isn't did Mr. Flaherty at some point to someone say the words chronic fatigue syndrome. The issue is was there discrimination on the basis of a disability. The district court on the record correctly found that there was no, that he couldn't make that claim out as a matter of law because he couldn't meet the essential functions of the job having not had his access. And that's consistent with every other court that's looked at this, from the Third Circuit in the McNeilis case, the Southern District in the Silver case, which also involved Entergy, to about half a dozen other district courts. Every court that's looked at the interplay between NRC access authorization, fitness for duty on the one hand, and the nondiscrimination laws on the other hand, has said if you lose your access or you're not fit for duty, you can't do the job. In all of the papers submitted by appellate, there's not a single court case where a court says we're going to reverse summary judgment here on an access denial and let this claim go through. The McNeilis case, I think, puts it perfectly. It says to the extent there's a tension between the ADA and the access authorization rules, that's a feature, not a bug, of the regulation. And the regulation is designed with this specific type of security workplace and security concern in mind. On that point, I would also just reemphasize we've looked and there is no contrary authority on this point. The law is uniform here. Just to briefly address the pretext issue, once the district court concluded that Entergy had proffered a legitimate nondiscriminatory reason for taking its action under the McDonnell-Douglas framework, the burden then shifts to Mr. Flaherty to come forward with some evidence of pretext. The typical pretext case says look at these comparators over here. They did the same thing I did and they were treated differently. Or look at these instances of inconsistent application of your policy. There's none of that here. There's not even an argument on that. The pretext argument starts and ends in the same place. Because he says he disclosed in the past, that must mean that the explanation there to disclose is incorrect and that therefore is somehow pretext. None of the typical pretext arguments are made here. None of the evidence is present. In fact, what's in the record shows that Entergy applies its access authorization process and denials even-handedly. There's no evidence that individuals with disability are treated any differently with respect to access authorization. And there's nothing in the record that would support pretext. I'd also note that once the access authorization review process kicked into motion after the April 29th disclosure, Mr. Flaherty was examined by two physicians, Dr. Boyd and Dr. Baker. They both said the same thing to Entergy. Mr. Flaherty failed to disclose. Dr. Baker says he willfully failed to disclose. Both doctors said to Entergy, he's not qualified for access in a nuclear facility. Even if you accept everything else about what Mr. Flaherty argues here with respect to the affidavit and the date of disclosure and someone somewhere in HR heard about this at some point, there's no basis in the record to suggest that Entergy acted unreasonably or not in good faith when it relied on those doctors' opinions and denied the access. I would just finally say that I think this issue gets decided very easily on the motion to strike. It's an abusive discretion standard. The explanation that's been proffered as confusion doesn't hold up. The question at issue was a clear and direct question. There was no suggestion during deposition that there was any confusion. The explanation proffered was I understood the same question to mean two different things. Again, no explanation given at the time of deposition where Mr. Flaherty was represented. No latitude filed, no supplemental paper filed, nothing filed until summary judgment. This Court's decisions from as recently as Pena v. Honeywell all the way back decades are clear. It's bedrock law in this circuit. You can't file an affidavit at the 11th hour in an effort to oppose summary judgment and manufacture disputes of fact. Are there no other questions? Well, unless you have anything else to say. I don't, Your Honor. Thank you. Thank you. We will take a brief recess at this time. All rise. Thank you.